IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **PETER ALEXENKO**, | |
| Plaintiff, | |
| v. | No.     16 CV 11283 |
| **MICHAEL HOFFMAN**, individually and in his capacity as a police officer for the City of Naperville, Illinois, and **THE CITY OF NAPERVILLE**, an Illinois municipality, | Judge Ellis <br><br> Magistrate Judge Weisman |
| Defendants. | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS

By their attorneys of record, the plaintiff responds to the motion filed by the defendants, CITY OF NAPERVILLE ("Naperville"), and MICHAEL HOFFMAN ("Hoffman"), styled "**Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint**" [Doc. 23] and the accompanying memorandum [Doc. 23-1] as follows:

### I.   INTRODUCTION

The plaintiffs is a father who reported his child missing to the Naperville police. Rather than assisting the plaintiff in locating his child, the Naperville police simply told him that s/he[1] was "O.K."  Not only did the Naperville police refuse to help him find her,[2] in conjunction with Hoffman and the plaintiff's estranged domestic partner, Genevieve Hines, they actively blocked his efforts to find her without justification.

Concerned about his missing child, the plaintiff obtained an emergency order of protection commanding that s/he be returned to his custody and presented it to the

---

[1] The androgynous pronoun "s/he" is used in order to help avoid identifying the child in a publically filed document.
[2] The object pronoun "her" will be used in place of "him or her" or "him/her" but, as used herein, is also intended to be androgynous for the same reason.

defendants. Even in the face of the emergency order, the defendants continued to block the

plaintiff's efforts to locate his child. In so doing, they impermissibly substituted their own

judgment for that of the plaintiff – the child's lawful, custodial parent – and deprived him of

his constitutional rights.

## II. LEGAL STANDARD

In the context of a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6):

> "the court accepts all well-pleaded factual allegations as true and construes
> all reasonable inferences in the plaintiff's favor." *Mutter*, 17 F. Supp. 3d at
> 756. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's
> complaint must allege facts which, when taken as true, " 'plausibly suggest
> that the plaintiff has a right to relief, raising that possibility above a
> speculative level.' " *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597,
> 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc*, 496 F.3d
> 773, 776 (7th Cir. 2007)). The Court reads the complaint and assesses its
> plausibility as a whole. *See Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th
> Cir. 2011).

*Clay v. Cook Cty.*, 2017 WL 878451, at *2 (N.D. Ill. Mar. 6, 2017) (Dow, J.) (internal

quotation marks, parentheticals and citations unaltered).

Ultimately, "[a] complaint that invokes a recognized legal theory . . . and contains

plausible allegations on the material issues . . . cannot be dismissed under Rule 12."

*Robrinzine v. Big Lots Stores, Inc,* 156 F. Supp. 3d 920, 925 (N.D. Ill. 2016) (citing *Richards*

*v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012) and *Erickson v. Pardus*, 551 U.S. 89, 93

(2007)).

Finally, after *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) "it is not entirely clear

what level of scrutiny is to be applied in cases alleging a violation of the fundamental

constitutional right to familial relations. What is evident, however, is that courts are to use

some form of heightened scrutiny in analyzing these claims." *Doe v. Heck*, 327 F.3d 492, 519 (7th Cir. 2003), as amended on denial of reh'g (May 15, 2003) (citations omitted).

## III. ARGUMENT

### A. The defendants did not merely fail to enforce a court order, they acted intentionally in concert with Hines.

The defendants did not simply fail to enforce an order of protection as they argue in their brief. Rather, they actively impeded the plaintiff's ability to obtain relief under such an order, after they assisted in removing his child from his custody over his objections and without justification.

What befell the plaintiff is markedly different than the mere failure to act on a court order based on, for example, a decision about the allocation of resources. The plaintiff did not arrive at the police station out of the blue with a court order, asking them to enforce it. He went *back* to the Naperville police after they told him they were in communication with Hines, after they had undertaken to assure him that his child was safe, and after *they had directed him to communicate with her and Hines through one of their officers*. By doing so, the Naperville police deliberately interposed themselves between the plaintiff and his child – inviting him to rely on their assurances that she was alright and, most importantly, actively setting themselves up as the intermediary for communication between the plaintiff and his child.

Over the plaintiff's objections, his child was removed from his custody on October 10, 2015, with Hoffman's assistance, after Hoffman had responded to the plaintiff's 911 call in his capacity as a Naperville police officer. First Amended Complaint ("FAC") at ¶ 7. Thereafter, the plaintiff was unable to contact Hines or his child and was unable to ensure that his child was safe – the *plaintiff* had summoned the police to his home because of

*Hines'* behavior. FAC at ¶ 6, 8. After being unable to contact Hines or his child for nine days, the plaintiff turned again to the Naperville police, who told him that they were in contact with Hines and that his child was "O.K."; and the Naperville police directed the plaintiff to contact Hines and his child only through Hoffman. FAC at ¶ 8. The Naperville police did not put the plaintiff in contact with Hoffman however. Instead, they impeded the plaintiff's ability to contact him. FAC at ¶¶ 8, 10.

Even after the Circuit Court of DuPage County (the "Circuit Court") disagreed with the Naperville police department's assessment that the child was "O.K." where s/he was, and issued an emergency order of protection commanding that s/he be returned to the plaintiff's custody, they continued to block the plaintiff's access to her at Hoffman's direction. FAC at ¶¶ 8, 10. They not only substituted their judgment for the plaintiff's, they substituted their judgment for that of the Circuit Court and deliberately positioned themselves between the plaintiff and his child.

This Court must construe all reasonable inferences in the plaintiff's favor, and must read the complaint and assess its plausibility as a whole. See *Clay*, 2017 WL 878451, at *2. Why would the Naperville police refuse to assist the plaintiff in locating his child who, from the plaintiff's perspective, was *missing*? Because, unlike the plaintiff, they knew where s/he was and had taken it upon themselves to decide that s/he was "O.K." The defendants did not simply sit on the sidelines. They concealed the child's whereabouts in order to prevent the plaintiff from contacting her and regaining custody of her.

One can hardly imagine the panic that any parent would feel as a result of the indignity inherent in the following exchange:

> "I haven't been able to locate my child since your officers allowed my ex to take her nine days ago."

> "Don't worry, one of our officers is in communication with your ex, and the child is ok.  If you need anything more, you'll have to speak with that officer."

And on the next day:

> "Here is an emergency court order commanding my child's return.  I'd like to speak with that officer now in order to find my child.  Can you please call him to reception or tell me how to contact him?"
> "No, we will not."

After they had affirmatively set themselves up as the conduit for communication between the plaintiff and his child, the Naperville police blocked the plaintiff's attempt to contact and locate her, even after the plaintiff had obtained the emergency order.  As long as "'a parent adequately cares for his or her children . . . there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.'"  *Heck*, 327 F.3d at 519 (quoting *Troxel*, 530 U.S. at 68-69).  No justification existed at any time but, especially after the plaintiff presented the defendants with the emergency order, any rational basis upon which they could rest their decision to prevent the plaintiff from locating his child evaporated; and yet they still did so.  In effect, they created a frightening, extra-judicial forum in which *they* determined the plaintiff's rights without regard to the law or the courts.  This is exactly the type of action that Section 1983 was enacted to prevent and redress.

### B.  The plaintiff supplied a plausible reason for the defendants' actions.

In his dissent in *McCauley v. City of Chicago*, Judge Hamilton lamented that:

> *Iqbal 's* reliance on the fact/conclusion dichotomy is highly subjective, and returns courts to the long disapproved methods of analysis under the regime of code pleading . . . , [and its] reliance on "judicial experience and common sense" invites the highly subjective and inconsistent results that have been observed. The Iqbal concept of plausibility is "context-specific."   As a

practical matter, the concept invites district judges to exercise their individual views of the likely merits of the case at the outset, when the only information available is the complaint.

671 F.3d 611, 624-25 (7th Cir. 2011) (Hamilton, J. dissenting) (citations omitted).

The plaintiff alleged in his initially filed complaint that Hoffman began an amorous relationship with Hines after he encountered her in the context of responding to the plaintiff's 911 call. Complaint [Doc. 1] at ¶ 11. The plaintiff believes this was in fact an underlying reason for the defendants' actions described above, but he omitted this allegation from the FAC in order to avoid controversy over a collateral issue at the pleading stage. To the extent this Court finds this allegation is necessary under the "highly subjective" plausibility standard that has grown up in the wake of *Twombly* and *Iqbal* (see *Id.*), the plaintiff would re-plead it in a second, amended complaint.

### C. The plaintiff sufficiently pleaded a substantive due process claim under Section 1983.

In order to state a claim under Section 1983, "a plaintiff must allege that the defendants deprived him of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law." *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1009 (7th Cir. 2000).

The Supreme Court "has long recognized as a component of substantive due process the right to familial relations." *Id.* at 1018 (collecting cases). The collected "decisions recognize that the right of a man and woman to marry, and to bear and raise their children is the most fundamental of all rights—the foundation of not just this country, but of all civilization." *Id.* (collecting cases) (citations omitted). The "'forced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights . . . [and] there was interference with plaintiffs' rights of familial

association because [the child] was physically removed from her home and from her parents for a period of almost 18 hours . . . .'" *Id.* at 1019 (quoting *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir.1997)).  Substantive due process provides the appropriate vehicle for evaluating the constitutionality of government-forced separation of children from their parents. *Id.*

Removal by the state of a child from a parents' custody without any evidence of abuse – or even threatening to do so – violates a parent's right to due process secured by the Fourteenth Amendment.  See *Heck*, 327 F.3d 492, 524 (7th Cir. 2003); see also *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463 (7th Cir. 2011) and *Troxel*, 530 U.S. at 65–66 (collecting cases concerning the "fundamental right of parents to make decisions concerning the care, custody, and control of their children").  However, "the constitutional right to familial integrity is not absolute . . . [and] a balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse, especially in cases where children are removed from their homes." *Brokaw*, 235 F.3d at 1019 (citations omitted).

In the instant case, any rational basis upon which the defendants could possibly have rested their decision to prevent the plaintiff from contacting his child evaporated when the plaintiff presented the defendants with the emergency order of protection; and, if nothing else, the plaintiff pleaded a substantive due process claim by alleging that the defendants continued to block his attempts to do so thereafter.  Moreover, the facts show that no rational basis existed to block the plaintiff's access to his child at any time.

### D. The plaintiff sufficiently pleaded a claim for municipal liability under Section 1983.

To state a *Monell* claim:

> a plaintiff must plead "factual content that allows the court to draw the reasonable inference" that the municipality maintained a policy or custom that caused the alleged constitutional deprivation. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). "The required level of factual specificity rises with the complexity of the claim." *Id.* at 616–17; *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) ("A more complex case * * * will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected."). Mere "legal conclusions or elements of the cause of action" must be disregarded. *McCauley*, 671 F.3d at 617. Thus, "boilerplate" allegations that repeat the elements of a *Monell* claim without any further factual content are dismissed for failure to state a claim. See, *e.g.*, *Annan v. Vill. of Romeoville*, 2013 WL 673484, at *6 (N.D. Ill. Feb. 25, 2013) (holding that an allegation that defendant "maintains a policy by which officers use excessive force to arrest individuals with no probable cause or reasonable suspicion warranting such" was insufficient to state a *Monell* claim).

*Clay*, 2017 WL 878451, at *2 (parentheticals in original; internal punctuation and quotation marks unchanged).

In the instant case, the plaintiff pleaded enough facts to show how the dots should be connected. In *Annan*, the plaintiff pleaded that the municipality "maintain[ed] a policy by which officers use excessive force to arrest individuals with no probable cause or reasonable suspicion warranting such . . . , [but the] Complaint contain[ed] no other allegations that would support the existence of this purported policy." 2013 WL 673484, at *6. That is not the case here.

The Court must read the FAC and assess its plausibility as a whole. *Clay*, 2017 WL 878451, at *2. The plaintiff reported to the Naperville police that his child was, in effect, missing for nine days. Rather than sounding the alarm, issuing an "Amber" alert and assisting the plaintiff in any way they could, they nonchalantly told the plaintiff that, in

their opinion, his child was "O.K." and rebuffed him. They did so even after the plaintiff presented them with the emergency order.

When the plaintiff appeared at the Naperville police station on October 19, 2015, they were ready for him. Their *collective* lack of concern for a missing child shows that they had already conspired with Hoffman and Hines, and already had a plan in place, when the plaintiff arrived. Given the alarming nature of what the plaintiff reported, there is no plausible way they could have been so unconcerned unless it were "the policy or custom of the Naperville police department to allow Hoffman and others to handle files without direct supervision, and to not address citizen complaints about their unsupervised bad acts." FAC at ¶ 26.

This is supported by the fact that Hoffman was eventually fired when the guardian ad litem (an attorney appointed by the Circuit Court as opposed to an average citizen like the plaintiff) began to complain to the Naperville police as well. FAC at ¶ 15. Hoffman and the Naperville police were allowed to act freely, without supervision, until a court-appointed attorney inquired. It is also supported by the fact that the defendants resisted the plaintiff's attempts to regain custody of his child in the face of not one, but two, court orders (the emergency order entered on October 20, 2015, and the custody order entered on November 15, 2015). FAC at ¶¶ 9-12.

### E. The plaintiff sufficiently pleaded a "class-of-one" equal protection claim under Section 1983.

The plaintiff sufficiently pleaded that the defendants subjected him to unequal treatment in violation of the Equal Protection Clause. In *Geinosky v. City of Chicago*, the plaintiff sued the City of Chicago because he had received an inordinate number of parking tickets. 675 F.3d 743, 745 (7th Cir. 2012). The district court dismissed his equal protection

claim because, it reasoned, he had not specifically identified a similarly situated individual who was treated differently in his complaint. *Id.* at 746. The Seventh Circuit reversed, stating that:

> a meaningful application of the similarly situated requirement serves to distinguish between constitutional claims for discrimination and ordinary tort claims, and the plaintiff must eventually offer evidence of a similarly situated person. But as we explain below, in a straightforward official harassment case like the allegations here, forcing the plaintiff to name a person not so severely harassed serves no such purpose (and in any event certainly is not necessary in the complaint itself). Are there people in Chicago who have *not* received more than a dozen bogus parking tickets from the same police unit in a short time? Geinosky could find hundreds of those people on any page of the Chicago phone book.

*Id.* at 746 (internal citation and quotation marks omitted; parenthetical and emphasis in original).

Just as the *Geinosky* court could reasonably infer that hundreds of people who had not received more than a dozen bogus parking tickets existed, calling upon "judicial experience and common sense," this Court can also infer that most citizens who appear at the police station to report they have been unable to locate their child for nine days are not met with nonchalance and rebuffed.

*Geinosky* is strikingly similar to the instant case.[3] The plaintiff in *Geinosky* did:

> not know for certain why he was targeted. He suspects a connection between his estranged wife and [police] officers of Unit 253, but his case would be just as strong if the officers picked him to harass for no reason at all. The complaint clearly tells a story in which Geinosky was targeted. Reason and common sense provide no answer to why he was targeted that could be considered a legitimate exercise of police discretion.

*Id.* at 748.

---

[3] Interestingly, after the FAC was filed, the plaintiff's car was towed in Naperville. It had been parked in a tow zone overnight, but so had numerous other cars. Only the plaintiff's car was towed.

In the instant case, the FAC also clearly tells a story in which the plaintiff was targeted. Likewise, reason and common sense provide no explanation for the defendants' actions that could be considered a legitimate exercise of police discretion. The plaintiff sufficiently pleaded that the defendants subjected him to unequal treatment in violation of the Equal Protection Clause.

Finally, the plaintiff's equal protection claim does not conflict with his *Monell* claim. His *Monell* claim does not *require* the defendants to have subjected other citizens to the exact, same treatment to which he was subjected. It is sufficient that it was "the policy or custom of the Naperville police department to allow Hoffman and others to handle files without direct supervision, and to not address citizen complaints about their unsupervised bad acts." FAC at ¶ 26. A complaint should merely narrate a claim: "Having specified the wrong done to him, a plaintiff may substitute one legal theory for another without altering the complaint . . . . A complaint may not be dismissed unless it is impossible to prevail 'under any set of facts that could be proved consistent with the allegations.' " *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir.1997) (citation omitted).

### F. Hoffman is not entitled to absolute immunity for his actions outside of court.

If Hoffman is entitled to absolute immunity as the defendants argue, it can only be with respect to his actions in court. *Millspaugh v. County Dept. of Public Welfare of Wabash County*, 937 F.2d 1172, 1175 (7th Cir. 1991). *Millaspaugh* affirmed that "social workers and like public officials are entitled to absolute immunity in child custody cases on account of *testimony* and other steps taken to *present the case for decision* by the court." *Id.* at 1176 (emphasis added). Such immunity is not boundless however, and "the dividing line between absolute and qualified immunity is whether the injury depends on the judicial

decision. If there would be no loss but for the judge's acts, then the prosecutor or witness who induces the judge to act has absolute immunity." *Id.* at 1175.

For example, in *Millspaugh* a defendant social worker was not entitled to absolute immunity for actions taken outside of court even though such actions affected and were related to court proceedings. *Id.* at 1176. The defendant social worker's "application for the order initiating the case, and her journey to Indianapolis to obtain custody of the children . . . [were] much like a police officer's affidavit seeking a search warrant, which . . . falls outside the scope of absolute immunity." *Id.* (citation omitted). "Social workers must settle for qualified immunity when taking initial custody of children." *Id.*

Qualified immunity provides "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation and internal quotation marks omitted). Indeed, in *Millspaugh*, the record did:

> not establish anything of the sort, even giving the mothers the benefit of all reasonable inferences. The Department received a tip. Tucker investigated and found that the mothers' house had been stripped to the walls. The children had vanished from school. The minister who furnished food and lodging for a night in Kokomo reported that the children and their mothers had no money and no possessions except the clothes they were wearing, and that the mothers planned to travel without any stated itinerary or means to provide for their children.

*Id.*

Here, this Court has stayed discovery pending the resolution of this motion and no record exists apart from the facts pleaded in the FAC, which this court must take as true and construe all reasonable inferences in the plaintiff's favor. See *Clay*, 2017 WL 878451, at *2.

The facts in the instant case and *Millspaugh* are like night and day. A set forth above, Hoffman – and the Naperville police – actively blocked the plaintiff's attempts to

locate his child, both before and after the emergency order, and the second custody order, were entered.  To the extent it matters, the FAC does not allege Hoffman participated in the emergency proceedings in any way.  By the time the custody case was filed on October 26, 2015, the plaintiff had already been damaged in that his child had been removed from his custody for sixteen days. See FAC at ¶¶ 11-12.  The "forced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights . . . [and] there was interference with plaintiffs' rights of familial association because [the child] was physically removed from her home and from her parents for a period of almost 18 hours . . . ."  *Brokaw*, 235 F.3d at 1009 (citations and quotation marks omitted).

Finally, in accord with *Millspaugh*, even after the custody case commenced on October 26, 2015, Hoffman cannot enjoy absolute immunity for his out of court actions, such as facilitating Hines' removal of the plaintiff's personal property from his home on December 14, 2015.  FAC at ¶ 14.  If Hoffman is entitled to absolute immunity as the defendants argue, it can only be with respect to his actions in court.  *Millspaugh*, 937 F.2d at 1175.

### G.  IIED is a "continuing tort" and this Court's analysis cannot be confined to the final act pleaded.

The acts that gave rise to the plaintiff's claim for intentional infliction of emotional distress continued over a period of at least several months.  The defendants admit that act pleaded in the FAC occurred within the relevant, one-year limitations period.  The defendants erroneously suggest that this Court should therefore confine its analysis to that final act.  However, "[u]nder Illinois law, a cause of action for 'continuing torts' such as intentional infliction of emotional distress accrues 'at the time the last injurious act occurs or the conduct is abated.'"  *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 961 (N.D. Ill.

2010) (quoting *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 285 (2003)). In its analysis, this Court must therefore look to all of the defendants actions as set forth above, rather than just the final act pleaded in the FAC. See *Id.* at 962. When viewed as a whole, the defendants' actions easily satisfy the elements set forth in the defendants' brief.

### H. Regardless of the phrase "hypothetical and in the alternative," the defendants are on notice of the plaintiff's claims.

The plaintiff pleaded sufficient facts to put the defendants on notice of his claims. The inclusion or omission of the phrase "pleading hypothetically and in the alternative" has no effect upon that. Ultimately, a complaint should merely narrate a claim. "Having specified the wrong done to him, a plaintiff may substitute one legal theory for another without altering the complaint . . . ." *Albiero*, 122 F.3d at 419 (citation omitted)

### I. The plaintiff may recover punitive damages from Hoffman in his individual capacity.

"[I]n a suit where the complaint alleges the tortious conduct of an individual acting under color of state law, an individual capacity suit plainly lies, even if the plaintiff failed to spell out the defendant's capacity in the complaint." *Gentry v. Vill. of Bolingbrook*, 2007 WL 899573, at *1 (N.D. Ill. 2007) (quoting *Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991)). Punitive damages may be recovered against a government actor in his individual capacity. *Id.* As was the case in *Gentry*, when read as a whole, the FAC shows that the plaintiff sued Hoffman in his individual capacity.

### IV. CONCLUSION

For the reasons stated above, the defendants' motion to dismiss should be denied.

WHEREFORE, the plaintiff prays that this Court will:

A. Deny the defendants' motion to dismiss styled "Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint" in its entirety [Doc. 23 and the accompanying memorandum, Doc. 23-1]; and

B. Grant such further relief as may be fair and just in the premises.

Respectfully submitted,

/s/Paul Luka
One of the Plaintiff's Attorneys

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that he served the attached document on all parties of record via the Court's CM/ECF system on the date listed above in electronic file stamp.

/s/Paul Luka
One of the Plaintiff's Attorneys

George Spataro
Paul Luka
Mendoza Law, P.C.
120 S. State Street, Suite 400
Chicago, IL 60603
(312) 508-6010
paul@alexmendozalaw.com